Martin Yewchuk
Plaintiff *in Propria Persona*
26366 Lombardy Road
Mission Viejo, CA 92692

**IN AND FOR THE SUPERIOR COURT, ORANGE COUNTY**

**STATE OF CALIFORNIA**

MARTIN YEWCHUK

    PLAINTIFF

v.

TRADER JOE'S COMPANY

    DEFENDANT

_____/

CASE NO.  30-2020-01177652-CU-MC-CJC

**AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**UNDER AMERICANS WITH DISABILITIES ACT (ADA)**

Plaintiff Martin Yewchuck sues the defendant TRADER JOE'S COMPANY for declaratory and injunctive relief under Title III of the Americans with Disabilities Act (hereafter "ADA") and alleges the following:

**INTRODUCTION**

The plaintiff brings this action to enforce Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§12181-12189 as implemented under 28 CFR Part 36 (36.101 *et sequitur*), against the defendant TRADER JOE'S COMPANY.

Plaintiff has a disability that impairs one or more major life activities, specifically submitting to defendant's mitigation measures such as wearing a mask or other device or contrivance over his face or head aggravates his disability. Defendant discriminated against the plaintiff because of his disability and denied him equal access to the full and equal

enjoyment of the defendant's goods, services, facilities, privileges, advantages, and accommodations in violation of Title III of the ADA and its implementing regulation.

Defendant has retaliated against the plaintiff who attempted to exercise and enjoy his rights under the Americans with Disabilities Act and the defendant continues to engage in this conduct as a matter of its official written policies.

Defendant also maintains a policy in which each employee is instructed to act as if, and regard each of its invitees, employees, patrons and licensees have a contagious disease and are each a direct threat to everyone else; however, the defendant never conducts any individual assessment as required by law.  In fact, instead of complying with its own policies to "obey the law" and the law itself,  the defendant has an arrangement with local police to cite and arrest invitees for trespass and other crimes for refusing the mitigation measures of wearing a mask, face shield, and social distancing in retaliation of the protected individual exercise his rights that are presumed by the very policies of the defendant itself.

Individuals with disabilities, including but not limited to individuals who are unable to wear a medical device (mask or face shield) or other contrivance over their faces that obstruct their vision, cause psychological distress (anxiety or panic) or unnaturally restrict the amount of oxygen they breathe.

Specifically, Defendant has failed to ensure the accessibility of its premises located in 25410 Marguerite Parkway, Mission Viejo, California, and, as a result, the plaintiff has been prevented,  under threat of incarceration, from enjoying the services, or taking advantage of the benefits offered through Defendant's retail establishment.

## JURISDICTION AND VENUE

This court has jurisdiction over this action under Title III of the Americans with Disabilities Act and 28 U.S.C. §§ 1331 and 1345.  This Court has authority to grant a declaratory judgment pursuant to 28 U.S.C. §§2201 and 2202 and authority to grant equitable relief, monetary damages, and civil penalties under 42 U.S.C. § 12188 as implemented under 28 CFR Part 36 (36.101 *et sequitur*).

Venue is proper in the District of California pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiff resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

### PARTIES

Plaintiff Martin Yewchuk resides in Orange County, California and is an individual with a disability within the meaning of Title III of the ADA.  The plaintiff has a physical impairment that substantially limits plaintiff from engaging in one or more major life activities, including but not limited to breathing, speaking, practicing self-care, interacting with others, communication, and eating.

Defendant TRADER JOE'S COMPANY is a public accommodation with its physical place of business in Orange County California.  It is a publicly held corporation based in California.  Defendant has control over, is responsible for, and owns the premises located at 25410 Marguerite Parkway, Mission Viejo, CA 92692, upon which the incidents giving rise to this complaint occurred.

### PLAIN STATEMENT

Defendant is a public accommodation, a retail grocery store, that has unlawfully discriminated against the plaintiff and retaliated against plaintiff with the threat of incarceration among other things, to further aggravate its discriminatory conduct in violation of state and federal law and in violation of the plaintiff's medical privacy rights.  The defendant has undertaken such discriminatory conduct as a matter of a new business policy that purports to protect the public from an unproven contagious disease without any legal or moral duty, in violation of state public health policies.

### STATEMENTS OF FACT

Defendant is a grocery store serving tens of thousands of local residents each week and provides a variety of goods, services, privileges, advantages, and accommodations via its premises located at 25410 Marguerite Parkway, Mission Viejo, California.

Individuals with disabilities including the plaintiff frequently visit the business location of the defendant for these services and products.

Defendant has failed to ensure that its policies and practices permits the enjoyment of access to goods, services, privileges, advantages and accommodations.

On December 9th, 2020, plaintiff visited the defendant's location 25410 Marguerite Parkway, Mission Viejo, to shop and upon entering the store, Sarah R., manager of the store, approached the plaintiff and informed that he is required to undertake a medical intervention as a condition of shopping at the store. The plaintiff informed the manager that he was withing the protected class and continued to enter the store.

The defendant began intimidating and harassing the plaintiff to put on a medical device in order for him to continue shopping at the store.

Defendant demanded plaintiffs to leave the premises if plaintiff did not comply with defendant's demands.

The plaintiff did not comply with defendant's demands and stated that he was not wearing a mask due to his disability.

The defendant falsely reported a crime to the police, accusing the plaintiff of committing a crime when there was no violation, in order to impose its unlawful medical treatments upon the plaintiff or harass him so that he would submit to the unlawful medical intervention.

Plaintiff requests that this court take judicial notice of Section 201(h) of the Food, Drug and Cosmetic Act and its Final Guidance titled, "Classification of Products as Drugs and Devices & Additional Product Classification Issues:  Guidance for Industry and FDA Staff", published in September of 2017, in which the Food & Drug Administration defines wearing a mask for health purposes (if there is such a thing) as a medical device and the application of a medical device or contrivance.  A true and correct copy of this is included as Exhibit A.

Plaintiff further requests that the Food & Drug administration has never approved wearing such face masks, but only "authorized" them without any supporting medical and clinical data establishing any medical necessity or efficacy for wearing such contrivances.

Plaintiff further requests that this court take judicial notice of the fact that each and every manufacturer of these face masks disclaim any and all liability for their use.

- 4 -

Plaintiff also requests that this court take judicial notice of the law pertaining to premises liability in the State of California and the doctrine of assumption of risk; wherein, the defendant has no duty of care to engage in these practices that violate the law and the medical privacy rights (intangible property rights and the right of informed consent) of the plaintiff.  Moreover, the defendant has no insurable risk for the false presumption that the plaintiff is a direct threat.  To the contrary, defendant's policies violate public health policy that imposes procedural conditions before imposing any public health control measures upon anyone in the state and limits the imposition of control measures to require judicial oversight and approval.

**VIOLATION OF TITLE III OF THE ADA, 42 U.S.C. §§12181 *et sequitur*.**

The allegations contained in the preceding paragraphs are incorporated by reference.

Title III of the ADA and its implementing regulation prohibit discrimination on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation by any private entity that owns, leases (or leases to), or operates any place of public accommodation. 42 U.S.C. § 12182(a) as implemented under 28 CFR Part 36 (36.101 *et sequitur*).

Defendant is private entity whose operations affect commerce; they own and/or operate service establishments including but not limited to its retail locations, that provide goods and services to members of the public. 42 U.S.C. §§ 12181(7), 12182(a).

Defendant has discriminated and continues to discriminate against the plaintiff, an individual with disabilities, on the basis of disability in the full and equal enjoyment of its goods, services, facilities, privileges, advantages, and accommodations, including denying them the ability to independently shop for consumer goods and services at the defendant's retail locations. 42 U.S.C. §12182(a).

Defendant advertises and provides a range of benefits at its retail locations including the sale of consumer goods and services, all of which significantly enhance the ability of people in the community to be conveniently supplied with needed goods and services.  The plaintiff has been denied these benefits; frustrated; and was required to use alternate means to obtain these goods and services by the same means as others without such disabilities,

including means that deprived plaintiff of the ability to independently shop for goods and services.

Specifically, defendant has violated and continues to violate Title III of the Americans with Disabilities Act of 1990 (ADA) and the Americans with Disabilities Act Amendment Act (ADAAA) and its implementing regulations by:

The plaintiff informed the defendant on many occasions that he had a disability that impaired his ability to engage in one or more major life activities, specifically, that wearing a mask or any device or contrivance over his face or head aggravated his disability. The plaintiff requested reasonable modifications and each time was refused and in fact the defendant retaliated against the plaintiff for requesting reasonable modifications.

The defendant explained to the plaintiff that it had changed its policies to require these mitigation measures and that the plaintiff would be required to submit to these mitigation measures without informed consent and whether or not he agreed to accept them voluntarily. The defendant further explained several times that it intended to continue imposing these mitigation measures into the foreseeable future. The defendant's policies continue to this day.

Denying the plaintiff an opportunity to participate in and benefit from the goods, services, privileges, advantages, and accommodations provided through the defendant's facilities at its retail locations, 42 U.S.C. § 12182; and,

Providing the plaintiff an unequal opportunity to participate in or benefit from the goods services, privileges, advantages, and accommodations provided through the defendant's retail locations, 42 U.S.C. § 12182 as implemented under 28 CFR Part 36 (36.101 *et sequitur*); and,

Failing to take the necessary steps to ensure that the plaintiff is not excluded, denied services, segregated, or otherwise treated differently because of the absence of auxiliary aids and services, 42 U.S.C. § 12182 as implemented under 28 CFR Part 36 (36.101 *et sequitur*); and,

The defendant has retaliated against the plaintiff by threatening the plaintiff with being cited for trespass, an unrelated crime for which there would be no evidence of any

violation, because of the plaintiff's exercise of rights that are protected by the Americans with Disabilities Act.

Such discrimination persists notwithstanding the existence of readily available, well-established accommodations, including, but not limited to refraining from engaging with the plaintiff in any conversation pertaining to the application of such mitigation measures.

The plaintiff has commenced this action based on reasonable cause to believe that defendant is engaged in a pattern or practice of discrimination and that the plaintiff has been discriminated against and that such discrimination raises issues of general public importance. 42 U.S.C. § 12188 as implemented under 28 CFR Part 36 (36.101 *et sequitur*).

The plaintiff seeks declaratory and injunctive relief, monetary damages, and civil penalties against defendant.

As a result of Defendant's actions and/or omissions, the plaintiff has experienced frustration, additional burden, and marginalization; are is now unable to independently shop for his groceries or receive related services; and has been required to find alternative methods including the payment of unreasonable costs for "curbside" services that other patrons are not required to pay.

In addition to unlawfully denying the plaintiff the same and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, the defendant retaliated against the plaintiff by:

•    harassing the plaintiff about submitting to the mitigation measures and examinations and other health control measures, in violation of 28 CFR Part 36.203(c)(1), even though the defendant was duly advised by the plaintiff that the plaintiff is not subject to any health control measures by any court orders, or required to accept any mitigation measure, and that the defendant was not empowered by any court order, law or other legal duty (even any conceivable duty of care) to impose such interventions, examinations or control measures upon the plaintiff; and,

•    threatening the plaintiff with being falsely cited, arrested or incarcerated for unrelated crimes such as trespass or disorderly conduct; and,

1   • allowing other patrons to attack, threaten or verbally ridicule and abuse the plaintiff

2   in violation of the defendant's duty of care; and,

3   • harassing, coercing or intimidating the plaintiff because of plaintiff's disability; and,

4   • threatening the plaintiff with public humiliation and exclusion because of plaintiff's

5   disability.

6   By the conduct set forth in the preceding paragraphs, there is reasonable cause to

7   believe that Defendant has:

8   • engaged in a pattern or practice of discrimination, in violation of 42 U.S.C. § 12188

9   as implemented under 28 CFR Part 36 (36.101 *et sequitur*); and,

10  • discriminated against the plaintiff and such discrimination raises an issue of

11  general public importance, in violation of 42 U.S.C. § 12188 as implemented under 28 CFR

12  Part 36 (36.101 *et sequitur*) and the plaintiff's private right of action.

13  • the defendant wrongfully and ignorantly expresses the attitude toward the plaintiff

14  as if the plaintiff is a direct threat to others, yet has never complied with the individual

15  assessment criteria, to wit:

16  28 CFR Part 36.108:

17  "(b) In determining whether an individual poses a direct threat to the health or
    safety of others,

18  a public accommodation must make an **individualized assessment**,

19  based on reasonable judgment that relies on current medical knowledge or on
    the best available objective evidence,

20  
21  to ascertain: The nature, duration, and severity of the risk;

22  the probability that the potential injury will actually occur;

23  and whether reasonable modifications of policies, practices, or procedures or
    the provision of auxiliary aids or services will mitigate the risk."

24  **Plaintiff demands a jury trial.**

25  WHEREFORE, plaintiff demands judgment against the defendant and that the court

26  declare that Defendant's discriminatory actions and/or omissions as set forth in this

27  Complaint violate Title III of the ADA, 42 U.S.C. §§ 12181-12189 as implemented under 28

28  CFR Part 36 (36.101 *et sequitur*);

• And an order enjoining the defendant, along with its officers, agents, and employees, and all others in active concert or participation with them, from:

• Engaging in discriminatory acts and/or omissions against individuals with disabilities;

• and an order enjoining the defendant from implementing practices and policies in a manner that is inaccessible to individuals with disabilities within the meaning of Title III of the ADA, 42 U.S.C. §§ 12181-12189 as implemented under 28 CFR Part 36 (36.101 *et sequitur*);

• And ordering defendants to:

• Comply with the requirements of Title III of the ADA, 42 U.S.C. §§ 12181-12189 as implemented under 28 CFR Part 36 (36.101 *et sequitur*); and,

• Provide appropriate auxiliary aids and services; modify policies, practices, and procedures; and/or require alternative methods to ensure the accessibility of its premises and services to individuals with disabilities, 42 U.S.C. §12188(a) *et sequitur*; and,

• Take such affirmative steps as may be necessary to restore, as nearly as practicable, each identifiable victim of the Defendant's discriminatory conduct to the position that he or she would have been in but for the Defendant's conduct; and,

• Take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct and to eliminate, to the extent practicable, the effects of such conduct; and,

• Award monetary damages to aggrieved persons, in an appropriate amount for injuries suffered as the result of Defendant's failure to comply with the requirements of Title III of the ADA, 42 U.S.C. §§12181-12189 as implemented under 28 CFR Part 36 (36.101 *et sequitur*); and,

• Assess a civil penalty against the Defendant in an amount authorized by 42 U.S.C. §12188(a) *et sequitur* to vindicate the public interest; and,

• Order such other relief as the interests of justice may require.

DATED this ⟋⟍ day of June 2021.

_____
Martin Yewchuk, Plaintiff

SEE CALIFORNIA NOTARY, ATTACHED →

A notary public or other officer completing this
certificate verifies only the identity of the individual
who signed the document to which this certificate
is attached, and not the truthfulness, accuracy, or
validity of that document.

State of California
County of Orange_____

Subscribed and sworn to (or affirmed) before me on this 15th___
day of June_____, 20 21_, by Martin Yewchuk_____
_____,
proved to me on the basis of satisfactory evidence to be the
person(s) who appeared before me.

TEJAL MUNSIF
Notary Public - California
Orange County
Commission # 2335015
My Comm. Expires Oct 17, 2024

(Seal)                              Signature_____

*attached - amended Complaint*

# Classification of Products as Drugs and Devices & Additional Product Classification Issues: Guidance for Industry and FDA Staff

## *FINAL GUIDANCE*

*Additional copies are available from:*
*Office of Combination Products*
*Food and Drug Administration*
*WO32, Hub/Mail Room #5129*
*10903 New Hampshire Avenue*
*Silver Spring, MD 20993*
*(Tel) 301-796-8930*
*(Fax) 301-847-8619*
*http://www.fda.gov/CombinationProducts/default.htm.*

For questions regarding this document contact the Office of Combination Products at 301-796-8930 or combination@fda.gov.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Office of Combination Products**
**Office of Special Medical Programs**
**Office of the Commissioner**

**September 2017**

*Contains Nonbinding Recommendations*

## Table of Contents

I.   INTRODUCTION ...................................................................................................2

II.   WHAT IS THE PROCESS FOR OBTAINING A FORMAL CLASSIFICATION DETERMINATION FOR A PRODUCT? ...................................................................3

III.   WHAT DOES FDA CONSIDER IN DETERMINING WHETHER TO CLASSIFY A PRODUCT AS A DRUG OR DEVICE? ...................................................................4

   A.   STATUTORY DEFINITIONS ...............................................................................5

     1.   Drug ............................................................................................................5

     2.   Device .........................................................................................................5

   B.   CERTAIN KEY PROVISIONS OF THE DEFINITION OF DEVICE ............................5

     1.   "Similar or related article" in the definition of device ...............................6

     2.   "Primary intended purposes" in the definition of device............................6

     3.   "Chemical action" in the definition of device............................................7

     4.   "Within or on the body" in the definition of device ...................................7

     5.   Illustrative Examples...................................................................................8

   C.   HOW IS A PRODUCT CLASSIFIED IF IT MEETS THE DEFINITION FOR DRUG (OR FOR BOTH DRUG AND DEVICE) AND ALSO MEETS THE DEFINITION FOR BIOLOGICAL PRODUCT? ...........................................10

IV.   ADDITIONAL INFORMATION .........................................................................11

FREQUENTLY ASKED QUESTIONS .........................................................................12

*Contains Nonbinding Recommendations*

# Classification of Products as Drugs and Devices & Additional Product Classification Issues: Guidance for Industry and FDA Staff[1]

This guidance represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA office responsible for this guidance as listed on the title page of this guidance.

## I.   INTRODUCTION[1]

FDA regularly receives questions from medical product sponsors concerning the classification of their products.[2] We believe that efficient, effective regulation is facilitated by providing guidance on issues frequently raised in relation to Requests for Designation (RFDs) and other classification activities. In addition, providing as much clarity and predictability as possible with respect to product classifications should enable informed planning for product development. Accordingly, we have prepared this guidance to make the Agency's current thinking concerning certain product classification issues more readily and widely available.

While issues have arisen relating to whether a product should be classified as a drug, device, biological product, or combination product, most of these issues have related to whether a product should be classified as either a drug or a device.[3] Accordingly, this guidance focuses particularly on cases in which a product[4] may be classified as a drug or device.[5] This guidance also addresses additional issues relating to product classification, including how to obtain classification determinations from FDA for medical products.

This guidance is organized into two substantive sections.

---

[1] This guidance has been prepared by the Office of Combination Products in consultation with the Center for Biologics Evaluation and Research, the Center for Devices and Radiological Health, and the Center for Drug Evaluation and Research.

[2] Please note that "classification" as used in this guidance refers to a product's designation as a drug, device, biological product, or combination product. This is distinct from the use of the term "classification" in reference to the class (Class I, II, or III) of a device as described in section 513(a) of the Federal Food, Drug, and Cosmetic Act (FD&C Act).

[3] This guidance addresses the definitions for the terms drug, device, and biological product in section III. The term "combination product" is defined in 21 CFR 3.2(e). For further information regarding the definition for the term combination product and the regulation of combination products, please visit the webpage for the Office of Combination Products at www.fda.gov/CombinationProducts/default.htm.

[4] The guidance's discussion of the classification of products is also relevant to classification of the constituent parts of a combination product.

[5] This guidance focuses on classification of products for human use. Distinct considerations may apply in determining how to classify a product intended for use in animals.

2

*Contains Nonbinding Recommendations*

Section II offers guidance on the RFD process for obtaining a formal determination of a product's classification.

Section III presents general concepts regarding FDA's decision-making process for classification determinations and addresses issues that may arise in determining whether products should be classified as drugs or devices.[6]

The Agency recommends that sponsors contact the Office of Combination Products (OCP) to confirm the classification of any products they may wish to market if the appropriate classification is unclear or in dispute. Section IV provides contact information for OCP and responses to frequently asked questions.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word "should" in Agency guidances means that something is suggested or recommended, but not required.

## II.    WHAT IS THE PROCESS FOR OBTAINING A FORMAL CLASSIFICATION DETERMINATION FOR A PRODUCT?

If the classification of a product as a drug, device, biological product, or combination product is unclear or in dispute, a sponsor can submit an RFD to OCP in accordance with Part 3 of Title 21 of the Code of Federal Regulations (21 CFR Part 3) to obtain a formal classification determination for the product, as provided for under section 563 of the FD&C Act (21 USC 360bbb-2). Any RFD determined to be incomplete will be returned to the sponsor with a request for the missing information.[7]  21 CFR 3.8(a). Once OCP determines the RFD is complete for filing, the Agency reviews the RFD.

The sponsor recommends a classification in the RFD, and should explain the basis for the recommendation. While the sponsor should justify why it believes the product meets the recommended classification, we generally consider both the information provided in the RFD and other information available to the Agency at that time in making our designation.

Generally, OCP will respond to the sponsor in writing within sixty days of the RFD filing, identifying the classification of the product as a drug, device, biological product, or

---

[6] This section generally focuses on approaches for determining whether a product should be classified as a drug or a device, based on application of the statutory definitions for these terms under sections 201(g) and 201(h) of the FD&C Act (21 USC 321(g) and (h)), respectively. Please note that this document does not focus on the classification of products as biological products regulated under section 351(i) of the Public Health Service Act (PHS Act) (42 USC 262(i)). It also does not address under what circumstances certain human cells, tissues, or cellular or tissue-based products (HCT/Ps), as defined in 21 CFR Part 1271, are regulated solely under section 361 of the PHS Act. For guidance concerning HCT/Ps, please visit
http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Guidances/Tissue/.
[7] See 21 CFR 3.7 for content requirements for RFDs.

*Contains Nonbinding Recommendations*

combination product. If the Agency does not provide a written response within sixty days, the sponsor's recommendation respecting the classification of the product is considered to be the final determination. 21 USC 360bbb-2(b) and (c).

RFD determinations pertain only to the product as described in the designation letter, including its proposed use(s) or indication(s) for use. The Agency may modify a determination made under section 563 regarding the classification of a product or the component of FDA that will regulate the product either with the written consent of the sponsor or for public health reasons based on scientific evidence. 21 USC 360bbb-2(b) and (c).[8]

A new determination may be appropriate if there is a change in, for example, a proposed indication for use or in a component of the product, or if the sponsor or Agency becomes aware of additional information that reveals that the means by which the product achieves its primary intended purposes differ from what was originally described in the RFD. For example, if a sponsor wished to change the indication for a product and that new indication would be achieved through a different mechanism than the original indication, a different classification for the new indication might be appropriate.

Please contact OCP if you have questions regarding whether to submit an RFD, what information to provide, or issues to address in an RFD to ensure its completeness and clarity.[9]

## III.   WHAT DOES FDA CONSIDER IN DETERMINING WHETHER TO CLASSIFY A PRODUCT AS A DRUG OR DEVICE?

FDA's determination of whether to classify a product as a drug or device is based on statutory definitions, as set forth in sections 201(g) and 201(h) of the FD&C Act, respectively. We apply these definitions to products, relying on the scientific data that are available to FDA at the time of the classification determination concerning the product for its proposed use(s)/indication(s).[10]

---

[8] The sponsor may request reconsideration of the decision if its classification recommendation is not adopted by the Agency. See 21 CFR 3.8, 10.75. If the sponsor develops or becomes aware of new information that may affect the product's classification, the sponsor may also submit a new RFD seeking a new determination.

[9] More detailed information on the RFD process is provided in OCP's guidance *How to Write a Request for Designation (RFD), available at* http://www.fda.gov/RegulatoryInformation/Guidances/ucm126053.htm. A pre-RFD process is available if a sponsor wishes to obtain a preliminary, non-binding classification determination or to engage in preliminary classification discussions with the Agency before filing a formal RFD. The RFD and pre-RFD processes are also available to sponsors to clarify the Center assignment for medical products, though this issue is beyond the scope of this guidance. More information about the pre-RFD process is available at https://www.fda.gov/downloads/RegulatoryInformation/Guidances/UCM534898.pdf.

[10] If a product type has been classified by regulation, FDA would generally classify the product (including as a constituent part of a combination product) in accordance with the regulation, if the product (or constituent part) falls within the scope of that regulation. If the Agency concludes that it may be appropriate to propose changing a classification established by regulation, FDA would initiate notice and comment rulemaking to do so.[11] The device definition also includes a second exclusionary clause stating that a device "is not dependent upon being metabolized for the achievement of its primary intended purposes." This clause has not been at issue frequently in classification determinations. Accordingly, we do not offer guidance on its construction here. If sponsors have questions regarding the Agency's interpretation of this clause, they may contact OCP.

*Contains Nonbinding Recommendations*

Medical product classification determinations often focus substantially on whether a product that meets the definition of drug also meets the statutory definition of device. This section presents the drug and device definitions and discusses how the Agency addresses certain issues that arise when determining whether a product should be classified as a drug or device.

### A.   Statutory Definitions

#### 1.   Drug

Section 201(g) of the FD&C Act (21 USC 321(g)) provides that the term "drug" means:

> (A) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any articles specified in clause (A), (B), or (C). . . .

#### 2.   Device

Section 201(h) of the FD&C Act (21 USC 321(h)) provides that the term "device" means:

> an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is--
> (1) recognized in the official National Formulary, or the United States Pharmacopeia, or any supplement to them,
> (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or
> (3) intended to affect the structure or any function of the body of man or other animals, and
>
> which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes.

### B.   Certain key provisions of the definition of device

Conceptually, all FDA-regulated medical products meet the definition of "drug" under section 201(g) of the FD&C Act, due to the broader scope of the drug definition. For a medical product also to meet the more restrictive device definition under section 201(h) of the FD&C Act, it must (i) be "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article," and (ii) "*not* achieve its primary intended purposes through *chemical action* within or on the body of man or other animals" and (iii) "*not* [be] dependent upon being *metabolized* for the achievement of its primary intended purposes" (emphasis added).

5

*Contains Nonbinding Recommendations*

The sponsor presumably has the most complete information relevant to how its proposed product achieves its primary intended purpose(s). Sponsors seeking a classification determination should present all available data and other information potentially relevant to that determination (without regard to whether the data or information supports the sponsor's preferred outcome). For example, for a sponsor seeking to classify its proposed product as a device, those data should demonstrate that its product meets the definition of a device.

At the classification stage, sponsors would not be expected to have gathered sufficient data to demonstrate that their proposed product meets the applicable marketing authorization standard (e.g., data demonstrating effectiveness). Therefore, the focus of FDA's classification analysis is on how the product would be expected to achieve its primary intended purposes, assuming it is capable of achieving its primary intended purposes at all. FDA will use its best scientific judgment to evaluate all available information relevant to the classification determination, including information submitted by the sponsor or available in the literature.

The following discussion presents the Agency's current thinking on certain issues that arise with respect to the statutory definition of device.

### 1.  "Similar or related article" in the definition of device

The first clause of the device definition provides that the term "means an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or *other similar or related article* . . ." (emphasis added). The issue of whether a product may be considered a "similar or related article" under this clause can arise, for example, with regard to products in liquid, semi-liquid, gel, gas, or powder form. In some cases, such products are appropriately considered "similar or related articles," and may be classified as devices, so long as they also satisfy the remainder of the device definition under section 201(h) of the FD&C Act, including the chemical action exclusion discussed in section III.B.3 below. This could be the case, for example, for gels or powders put on the skin as a barrier, gases used as space fillers, or liquids used to clean either surgical instruments or contact lenses.

### 2.  "Primary intended purposes" in the definition of device

Most often, in determining whether a product meets the device definition, questions arise concerning the exclusionary clause of the definition, which provides that a device is a product "which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals . . . ."[11] A product that has chemical action could be a device if it does not achieve its primary intended purposes through that chemical action.

---

[11] The device definition also includes a second exclusionary clause stating that a device "is not dependent upon being metabolized for the achievement of its primary intended purposes." This clause has not been at issue frequently in classification determinations. Accordingly, we do not offer guidance on its construction here. If sponsors have questions regarding the Agency's interpretation of this clause, they may contact OCP.

*Contains Nonbinding Recommendations*

For example, if the primary intended purpose of a hip joint replacement implant is to restore movement, and the implant also elicits a foreign body response through chemical action, that response would not be considered a primary intended purpose of the implant. Accordingly, such an implant could be classified as a device despite the chemical action, because such action does not achieve the product's primary intended purpose. Similarly, if the primary intended purpose of an absorbable suture is to rejoin tissue, and the suture is also designed to be resorbed by the body through a combination of chemical action and metabolic activities, such resorption would not be considered a primary intended purpose of the product. Accordingly, such an absorbable suture could be classified as a device despite the chemical action and metabolic activity, because such action or activity does not achieve the product's primary intended purpose.

### 3.   "Chemical action" in the definition of device

FDA frequently receives questions from product sponsors concerning the Agency's interpretation of the term "chemical action." This term must be read in the context of the statutory definition of "device" as a whole. The determination of whether a product meets the device definition does not depend solely on whether the product exhibits "chemical action." In particular, as explained in section III.B.2 and 4, a product that exhibits chemical action will still meet the device definition if the product "does not achieve its primary intended purposes through" that chemical action "within or on the body," and otherwise satisfies the device definition.

Under the Agency's interpretation of the device definition, a product exhibits "chemical action" if it interacts at the molecular level with bodily components (e.g., cells or tissues) to mediate (including promoting or inhibiting) a bodily response, or with foreign entities (e.g., organisms or chemicals) so as to alter that entity's interaction with the body.[12] We note that this type of interaction is consistent with the term "pharmacological action" as that term is generally understood in the medical field. Accordingly, we have used "pharmacological action" as a short-hand throughout the rest of this guidance for ease of explication and recognition. The examples presented in section III.B.5 offer illustration of FDA's interpretation of chemical action.

### 4.   "Within or on the body" in the definition of device

Because a device "does not achieve its primary intended purposes through chemical action *within or on the body* of man or other animals" (emphasis added), a product can be a device even if it achieves its primary intended purposes through chemical action, so long as the chemical action does not occur "within or on the body" (and the product meets the other elements of the definition of device under section 201(h)).

Whether chemical action is occurring "within or on the body" is generally a straightforward matter. If the chemical action is occurring inside the body or on the surface of the body, it is within or on the body. For example, the chemical action of an orally ingested pill

---

[12] For purposes of this interpretation, an interaction at the molecular level occurs through either chemical reaction (i.e., formation or breaking of covalent or ionic bonds), intermolecular forces (e.g., electrostatic interactions), or both. The mere exchange of non-chemical energy (e.g., electromagnetic or thermal energy) between a product and the body would not constitute "chemical action."

*Contains Nonbinding Recommendations*

or tablet of a decongestant would be "within the body," and the chemical action of a spray or cream for treatment of dermatitis when applied to the skin would be "on the body." Similarly, it is generally a straightforward matter to determine that chemical action is not occurring within or on the body. For example, the chemical action of an antimicrobial agent used to clean a surgical instrument before that instrument is used is not occurring within or on the body.

However, the Agency has on occasion considered some situations in which it may be less clear whether chemical action is occurring within or on the body. For example, we have determined that chemical action occurring solely within an extracorporeal device, specifically a kidney hemodialysis machine, is not occurring within or on the body. Similarly, we have determined that the chemical action of a transport solution to preserve a donor organ for transplantation while in an organ transport container is not occurring within or on the body.

### 5.   Illustrative Examples

The following examples further illustrate the application of some of the key provisions of the device definition discussed above. Table 1 contains some examples of medical products that achieve their primary intended purposes through chemical action within or on the body. Table 2 contains some examples of medical products that do not achieve their primary intended purposes through chemical action within or on the body.

### Table 1:   Examples of Medical Products that Achieve Their Primary Intended Purposes through Chemical Action within or on the Body

| Product | Description |
|---|---|
| Aspirin | Aspirin is used for pain relief. Acetylsalicyclic acid (aspirin) contains an acetyl group that has the ability to covalently bind to a serine residue of a cyclooxygenase enzyme (COX-1 or COX-2). This is considered pharmacological action because it inactivates the enzyme and thereby inhibits the synthesis of prostaglandin and thromboxanes, which suppresses the body's inflammatory response for pain relief. |
| Beta Blockers | Beta blockers are used to reduce blood pressure. Cells contain beta receptors that can be stimulated by neurotransmitters such as adrenaline/epinephrine. Beta blockers, like propranolol, bind beta receptors (b1 and b2) and exhibit pharmacological action by inhibiting the activation of the signaling cascade. This blockage causes cardiac cells to reduce the strength of cardiac contractions and heart rate. |
| Magnesium Sulfate | Magnesium sulfate is used as replacement therapy for magnesium deficiency. It acts as a catalyst in enzymatic reactions (a molecular-level interaction). While the chemical or atomic structure of magnesium sulfate is not altered, its participation in enzymatic reactions is considered a pharmacological action because it impacts various cellular and molecular processes. |

*Contains Nonbinding Recommendations*

| | |
|---|---|
| Polymyxin B Sulfate | Polymyxin B sulfate is an antibiotic that is used to treat bacterial infection. It is composed of a cationic protein surfactant that has fatty acid functional groups. Polymyxin B sulfate acts through intermolecular forces, by binding to components of the bacterial membrane (i.e., the membrane of the foreign entity) and by association/fusion of the fatty acid portion of the molecule with the lipid bilayer via hydrophobic interactions.  This binding is a pharmacological action because it disrupts the integrity of the bacterial membrane, which causes organism death, thereby treating the bacterial infection. |
| Hydroxocobalamin | Hydroxocobalamin is used as an antidote to cyanide poisoning. The cobalt moiety of hydroxocobalamin exhibits pharmacological action because it chemically reacts with cyanide, a toxic chemical agent, to form cyanocobalamin, a non-toxic compound, and the ability of hydroxocobalamin to interact with cyanide facilitates the removal of the toxic agent in order to inhibit the toxic effects of cyanide on the body. |

**Table 2:   Examples of Medical Products That Do Not Achieve Their Primary Intended Purposes through Chemical Action within or on the Body**

| Product | Description |
|---|---|
| Abdominal Adhesion Barrier | Inert, biodegradable synthetic polymers can be used to reduce post-operative adhesions with tissues and organs within the abdominal cavity. An implanted physical barrier sheet composed of such polymers would act to reduce adhesion through physical separation of tissue and not through pharmacological action on the surrounding tissue. |
| Polymethylmethacrylate (PMMA) | PMMA is an acrylate polymer that is used as a temporary bone spacer. PMMA is built from methyl methacrylate monomer units, which undergo free radical polymerization in the presence of an initiator compound. The molecules that are part of the polymerization process interact with each other to create a solid mass to fill a bone void physically. The process does not require an interaction between the PMMA and the bone at the molecular level and, therefore is not considered chemical action within or on the body. |
| Topical Surgical Adhesive | Cyanoacrylate is an acrylic resin that is used to approximate skin tissue as an adjunct to a wound closure product. The resin undergoes anionic polymerization in the presence of water. The chemical reaction that occurs between the resin and ions in the water allows it to form into long polymer chains. This type of adhesive can bond to a cut/incision, creating a physically-intact film to aid in keeping skin edges together.  While the product binds to tissue, it does not exhibit pharmacological action because that binding does not mediate a bodily response. |

*Contains Nonbinding Recommendations*

| Gold Nanoparticles | Nanoparticles composed of gold can be used to treat cancer. When gold nanoparticles are injected into a tumor site and exposed to electromagnetic energy, they absorb the electromagnetic energy and convert it to thermal energy, and this heat is transferred to the surrounding cells or tissue. The heat transfer, as opposed to a binding interaction with the nanoparticle, causes the cancer cells to die. Therefore, this effect is not achieved through chemical action. |
|---|---|
| Cryosurgery for Wart Removal | Cryogen (liquid gas), such as nitrogen or dimethyl ether, is used to treat common and plantar warts. The liquid gas is extremely cold and freezes the wart, resulting in damage to the topmost layer of cells. A physiological effect (i.e., cell death) results from heat transfer, not from a binding interaction with the gas. Therefore, the freezing is not considered chemical action. |
| Dental Amalgam | A resin that fills a cavity in a tooth as part of the treatment of dental caries may bind to the tooth via covalent bonding, or rely in part on intermolecular forces to change from liquid or paste to solid form. However, this binding and/or state change does not mediate a bodily response, but rather produces a solid mass, to fill the cavity. Therefore, it would not be considered chemical action. |
| Respirator Mask with Antimicrobial Filter | An antimicrobial product impregnated into a filter on a respirator mask to kill microbes that the user might otherwise inhale would exhibit pharmacological action. However, while the mask is in contact with the user's face, the filter is not. So, the chemical action occurring on the filter is not occurring within or on the body. |

### C. How is a product classified if it meets the definition for drug (or for both drug and device) and also meets the definition for biological product?

As explained in section III.B, products that meet the device definition in 201(h) of the FD&C Act also meet the drug definition in 201(g) of the FD&C Act. In addition, products that meet the drug definition, or both the drug and device definitions, may also meet the definition of biological product under section 351(i) of the PHS Act (42 USC 262(i)).

Section 351(i) provides that:

The term "biological product" means a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein (except any chemically synthesized polypeptide),[13] or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings.

---

[13] For guidance on FDA's interpretation of the category "protein (except any chemically synthesized polypeptide)" see *Biosimilars: Questions and Answers Regarding Implementation of the Biologics Price Competition and Innovation Act of 2009*, at Q.II.1 (April 2015), *available at* http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM444661.pdf.

*Contains Nonbinding Recommendations*

Products that meet the drug definition and that also meet the definition of biological product are classified as biological products, and are generally subject to licensure under the PHS Act.[14] Products that meet the definitions for drug, device, and biological product may also be classified as biological products.  If you have questions regarding whether a product meets the definition of biological product or how this might affect its classification, please contact OCP.

## IV.   ADDITIONAL INFORMATION

For further information on the classification of products as devices, drugs, biological products, or combination products, please refer to the Frequently Asked Questions on the next page, OCP's webpage at https://www.fda.gov/CombinationProducts/default.htm or contact OCP at:

Office of Combination Product
Food and Drug Administration
WO32, Hub/Mail Room #5129
10903 New Hampshire Avenue
Silver Spring, MD 20993

(Tel) 301-796-8930
(Fax) 301301-847-8619
combination@fda.gov

---

[14] Certain biological products have been historically approved under the FD&C Act and may continue to be subject to approval under the FD&C Act until March 23, 2020.  See Section 7002(e) of the Biological Price Competition and Innovation Act of 2009; see also FDA, *Implementation of the "Deemed to be a License" Provision of the Biologics Price Competition and Innovation Act of 2009, available at* https://www.fda.gov/ucm/groups/fdagov-public/@fdagov-drugs-gen/documents/document/ucm490264.pdf.

11

*Contains Nonbinding Recommendations*

## FREQUENTLY ASKED QUESTIONS

1. Can a product be classified as a device if it exhibits "chemical action"?

   Yes, if the product does not achieve its primary intended purposes through chemical action within or on the body and otherwise meets the definition of a device. However, products that meet the device definition may be regulated as drugs or biological products in some cases. See question 2.

2. If a product meets the definition for drug at 21 USC 321(g) and for device at 21 USC 321(h), how is it classified?

   Generally, the product would be classified as a device, unless it falls within a special category (for example, apparatuses used in the preparation of compounded positron emission tomography drugs are classified as drugs, see 21 USC 321(ii)).

3. Can the proposed use or indication of a product affect its classification?

   Yes. Two products with exactly the same composition can be classified differently based on their primary intended purposes. For example, if a vaginal product is intended solely to facilitate ease and comfort during sexual intercourse and it achieves this through lubrication that decreases friction (via mechanical/physical action) and not through chemical action, it is classified as a device. However, the same product can be classified as a drug if it is intended, for instance, to alter pH, control odor, or prevent infection, and does so through chemical action as discussed in III.B.3 above.

4. What should you do if, after reviewing this guidance, you are unsure of how your product is classified?

   You should contact the Office of Combination Products (Combination@FDA.GOV) for feedback. OCP will provide you feedback, including on whether a pre-RFD or an RFD may be appropriate and what information you should provide.

5. Where can you find additional information about product classification?

   Additional information on classification is posted on OCP's webpage at:(https://www.fda.gov/CombinationProducts/AboutCombinationProducts/ucm101496.htm)

   For additional information on how to submit an RFD, see *How to Write a Request for Designation (RFD)* (http://www.fda.gov/RegulatoryInformation/Guidances/ucm126053.htm).

   More information about the pre-RFD process is available at https://www.fda.gov/downloads/RegulatoryInformation/Guidances/UCM534898.pdf .